Theresa **GUARNIERI**, as Administratrix of the goods, chattels and credits which were of Nazario Guarnieri, deceased, Plaintiff-Appellee,

v.

**KEWANEE–ROSS CORPORATION**, Defendant-Appellant and Third-Party Plaintiff-Appellee,

Burnham Corporation, Third-Party Defendant-Appellant.

No. 144, Docket 24708.

United States Court of Appeals Second Circuit.

Argued Feb. 5, 6, 1958.

Decided Feb. 6, 1959.

William C. Mattison, Brooklyn, N. Y. (James Dempsey, Peekskill, N. Y., Thomas Grimes, New York City, Thomas P. Keenan, Jr., Maspeth, N. Y., on the brief), for plaintiff-appellee, Theresa Guarnieri.

John F. Dooling, Jr., New York City (Sullivan & Cromwell, James A. Thomas, Jr. and Stephen Rackow Kaye, New York City, on the brief), for defendant and third-party plaintiff, Kewanee-Ross Corp.

John V. Downey, New York City (MacIntyre, Burke & Downey, New York City, on the brief), for third-party defendant-appellant, Burnham Corp.

Before MEDINA, WATERMAN and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Kewanee-Ross Corporation (hereinafter referred to as "Kewanee"), the sole defendant in the action instituted by plaintiff to recover damages for the wrongful death of Nazario Guarnieri, appeals from a judgment for $75,000 entered against it in plaintiff's favor after a jury trial.

Burnham Corporation (hereinafter referred to as "Burnham"), the third-party defendant, brought into the action by Kewanee as the third-party plaintiff, appeals from a judgment in favor of Kewanee against it for the same amount, i.e. $75,000. Jurisdiction is based upon diversity, the action having been removed from the New York State Supreme Court.

Plaintiff, as administratrix, brought suit against Kewanee for the death of her husband, an employee of Burnham, who was killed when a cylinder manufactured by Kewanee exploded while being pressure tested in Burnham's plant by Burnham employees in the presence of United States Government inspectors.

The alleged cause of the accident was the failure by Kewanee properly to weld the part of the cylinder which gave way. The issue posed by the complaint was whether Kewanee was negligent in making, manufacturing and welding the cylinder. Any liability on Kewanee's part was, thus, dependent upon proof of negligence by Kewanee.

Kewanee answered by asserting that the injuries causing death were suffered while the "boiler" (cylinder) was under the exclusive control of Burnham and while it was being tested to discover whether there were any defects in the "boiler." Kewanee also pleaded as a defense that as between Kewanee and Burnham the tests were to be conducted at Burnham's factory and that Kewanee relied upon Burnham to make a proper test with adequate safeguards.

About a year and a half after the action was commenced Kewanee impleaded Burnham in a third-party action alleging that decedent's death was caused not by "any act or omission by third-party plaintiff Kewanee-Ross Corporation, but solely and exclusively the negligence of Burnham Corporation in conducting the aforesaid test, and its negligence in failing to provide proper and adequate safeguards while the test was being conducted."

The issues between the three parties as framed by the pleadings (and developed during the trial by proof and argument) were quite different both as to matters of law and fact. As between plaintiff and Kewanee, using Kewanee's own standards, plaintiff had to prove:

"1. The boiler contained a defect when it left Kewanee's plant; the defect was the result of Kewanee's failure to exercise due care in constructing the boiler; and Kewanee failed properly to inspect the boiler with the defect before shipping it.

"2. The defect in the weld was the proximate cause of the accident which resulted in the death of plaintiff's decedent.

"3. Plaintiff's decedent was owed a duty of care by Kewanee, and was foreseeably within the risk of harm flowing from Kewanee's negligence" (Kewanee Brief, pp. 6–7).

To defeat plaintiff's claim, Kewanee argues that to weld the head of the boiler inadequately was not negligence; that the boiler was not inherently dangerous; that it was incomplete, "uninspected, untested, unready, and understood to be unready for use." In short, Kewanee disclaims any responsibility to properly weld the head on the boiler because it knew that Burnham was going to pressure test the boiler before it was delivered to the ultimate user.

As between Kewanee and Burnham the issues alleged in Kewanee's third-party complaint were whether Burnham "undertook to perform tests" and whether Kewanee "relied on, and was justified in relying on, Burnham Corporation to make a proper, careful test of such 'boiler' with adequate safeguards"; and whether there was any indemnity by operation of law.

The resolution of these various issues and a fair decision in this case depends in large part upon the proof and the instructions on the law given to the jury to guide them in making this determination. These instructions assume a peculiarly important role in this case because of the distinct differences in the issues between the three parties and the proof applicable thereto.

### The Facts.

*The Purchase Order*

In early 1952 Burnham was engaged in the manufacture of parts of a guided missile referred to under the code name of "Honest John." The fabrication of the cylinder was entrusted by contract to Kewanee. The contractual arrangements between Burnham and Kewanee were set forth in a series of letters and specifications (Exhs. 1–4). In its letter to Kewanee, dated March 8, 1952, Burnham enclosed specifications which stated the work to be done by Kewanee. A more detailed proposal was submitted by Kewanee to Burnham, dated March 13, 1952, which was embodied in the actual purchase order sent by Burnham to Kewanee, dated April 2, 1952 (Exh. 4).

In substance Burnham ordered 138 "Honest John" units to be manufactured by Kewanee according to drawings and specifications submitted. The cylinders were to be formed from pieces of steel which were to be welded together. On one end of the cylinder a head plate was to be welded. An automatic welding process was used by Kewanee for this purpose.

The instructions amongst other details specified "Weld inside and outside—Do not grind weld"; "Automatic weld circumferential seams"; "Magnaflux or X-ray joints 1st two units only"; "Repair welds if necessary." The letter of March 13, 1952 (Kewanee to Burnham) further provided "Cost of Magnaflux or X-ray is not included in our quoted price. We understand that you would like to have the first few units X-rayed. We will X-ray as many units as you request—[at Burnham's expense] * * *" A proof test of the welded seams was to be made by Kewanee "by making a cylinder three feet long and welding a head on each end with one inch couplings in the heads and testing to 1,800 per square inch." Workmanship was "All to be first class in every respect." Under the heading "Inspection and Responsibility" of the specifications attached to the purchase order letter of April 2, 1952 (Exh. 4) it was provided: "All fabricated material is subject to inspection and acceptance by representatives of the purchaser and/or their customer. Although the fabricator is not responsible for the design, he shall be responsible for workmanship and materials furnished by him and shall guarantee such material and workmanship for a period of 6 months from commencement of use by the purchaser's customer. Therefore, acceptance does not relieve the fabricator of responsibility for poor workmanship or materials, nor does it relieve him of errors in fabrication which may later come to light in the use of this material by the purchas-

er's customer." Kewanee accepted the order with certain modifications not relevant to the issues here by letter dated May 22, 1952 (Exh. 5).

Kewanee proceeded to fabricate the cylinders. One operation called for cutting a hole in the head plate, inserting therein a piece of steel known as a "boss" and welding it. The thickness of the metal being $\frac{5}{16}$ of an inch the weld had to be the same thickness. The weld, performed by using an automatic welding machine, required an inside weld and an outside weld which should have fused together forming a solid piece of metal and causing the boss to become firmly attached to the cylinder head to withstand the specified pressure (1,800 pounds per square inch) (Exh. 2).

The cylinder supposedly so welded, designated K–62, was the cause of decedent's death. It was delivered to Burnham after having had certain machining operations performed by the S & S Corrugated Paper Machinery Company. This operation was designed to smooth the weld and did not materially affect its strength.

On July 11, 1952 cylinder, K–62, was subjected by Burnham at its plant to the usual hydrostatic test, the purpose of which was to ascertain whether the cylinder would withstand a pressure of 1,800 pounds per square inch. The procedure consisted of filling the cylinder with water and gradually increasing the pressure. The test was conducted in an area through which Burnham's employees passed on their way to check in and out or to reach locker and lavatory facilities. Just before closing time and as decedent was in front of K–62, the welded boss then under 1,500 pounds per square inch pressure became detached from the head permitting a stream of water under high pressure to escape which struck and hurled decedent some twenty-five feet across the room, causing injuries from which he died shortly thereafter.

When the broken weld was examined it was discovered that the inside and outside welds had not met or fused. Instead of being $\frac{3}{16}$ of an inch thick they were only 40 to 60 per cent of $\frac{5}{16}$ of an inch. There was expert testimony that such an incomplete weld would have been expected to fail at 1,500 pounds pressure but had there been a complete weld the boss would have remained welded to the head at such pressure.

*Plaintiff's Case Against Kewanee.*

To recover against Kewanee plaintiff had to establish that decedent's death was the result of Kewanee's negligence in making the weld. As Kewanee states the prerequisites to recover (Kewanee Brief, pp. 6–7), plaintiff had to show: (1) that the cylinder contained a defect which "was the result of Kewanee's failure to exercise due care in constructing the boiler" and that Kewanee failed properly to inspect; (2) that the defect was the proximate cause of decedent's death; and (3) that decedent was foreseeably within the risk of harm flowing from Kewanee's negligence.

The trial judge charged the jury that plaintiff must prove negligence by Kewanee and that the negligence must be the cause of the accident, specifically "whether the defendant Kewanee used due care in preparing a proper formula or procedure for this welding, whether it used proper equipment and material, in so far as it supplied any of the material, and whether it made proper provision for testing the weld." Dealing with Kewanee's contention that it had turned over to Burnham all testing, and hence was relieved of all responsibility therefor, the court charged that if Kewanee was not negligent in the respects indicated (namely, Kewanee's reliance upon Burnham performing the test) "Your verdict is for the defendant." Thus the verdict for plaintiff against Kewanee could only have been premised upon Kewanee's failure to use due care and upon a negative answer to Kewanee's claim that it had been relieved of all testing responsibility.

The next issue to be resolved by the jury was: " * * * was it foreseeable that the plaintiff [decedent] would be in the vicinity at the time it was so

used?" (Court's charge, 489a.) If the proof did not establish "foreseeability" the jury were told that "your verdict is for the defendant." The plaintiff's verdict of necessity gave the answer that decedent's presence was foreseeable.

The court then turned to "proximate cause." He defined it as " * * * whether the negligence of Kewanee * * * is a substantial factor in causing the accident" and referred directly to Kewanee's claim that its negligence was not the cause of the accident "but it was caused by the unforeseeable negligence of Burnham in conducting this test in the manner in which it conducted it." The problem to be resolved was put as follows: "Now, the question is, was Burnham's conduct of the test so unforeseeable and such an abnormal thing that the injury, the accident which caused the injury, could not be regarded as the normal consequence of the negligence of Kewanee, if Kewanee was negligent. If you conclude that it was not the normal consequence, that it was the result of this abnormal superseding force, the acts of Burnham, why, your verdict must be for the defendant." Again the jury could only have answered this question in the negative and determined that Burnham's conduct was not unforeseeable or abnormal.

The court further emphasized the relationship of Burnham's acts to Kewanee's liability by saying: " * * * if you conclude that it was Burnham's superseding acts which were the proximate cause of this injury, and that it wasn't the normal consequence of Kewanee's negligence, if you find it, why, then, again you would return a defendant's verdict."

Upon these instructions as to the law the jury returned a verdict for the plaintiff. To reach this result, since it is presumed that the jury followed the law as outlined by the court, in summary the jury must have found: (1) that Kewanee was negligent in making the weld; (2) that an arrangement was not made that "the test was turned over to Burnham and that Kewanee relied upon Burnham's performing this test instead of Kewanee doing it itself" (488a); (3) that Kewanee was not entitled to rely on Burnham for the performance of the test as a discharge of Kewanee's responsibility; (4) that Kewanee should have foreseen that decedent would be in the vicinity at the time of the test; (5) that Kewanee's negligence was the proximate cause of decedent's injury and death; (6) that Burnham's superseding acts were not the proximate cause of the accident; and (7) that the accident was the normal consequence of Kewanee's negligence. Under the court's charge these conclusions of active negligence were essential to a plaintiff's verdict. There being sufficient proof to support this result, the judgment in favor of plaintiff against Kewanee must be affirmed.

### Kewanee's Case Against Burnham

Against this factual background as determined by the jury, what is Kewanee's case against Burnham? The third-party complaint alleges that decedent's death was caused "not [by] any act or omission by third-party plaintiff Kewanee-Ross Corporation but solely and exclusively [by] the negligence of Burnham Corporation in conducting the aforesaid test * * * " This fact question has already been answered adversely to Kewanee by the jury, it being an essential element to plaintiff's recovery against Kewanee. However, during the trial various theories of liability were advanced by Kewanee which must be analyzed. As previously stated the issues of law and fact between plaintiff and Kewanee and between Kewanee and Burnham are quite different. The trial court in argument on exceptions and requests after the charge recognized this, saying: "The plaintiff has a different set of issues from that between Kewanee and Burnham, and, in the second place, what you really have here are two separate cases, consolidated for the convenience of trial, because the same witnesses will testify as to both cases" (507a).

To defeat plaintiff's claim, Kewanee argues that the defective weld was not an

act of negligence because if the cylinder had been thrown on a scrap heap and never used no harm could have resulted. However, Kewanee not only knew it would be used but that it would be subjected to high pressures. Kewanee then contends that Burnham alone was to make the test. There is no question that Burnham in conjunction with government inspectors was to make the 1,800 pounds per square inch test at Burnham's plant but it had a right to rely on a properly welded cylinder on which to make the test. Kewanee's argument that "Shipping cylinders with incomplete welding was not even a breach of contract with Burnham * * *" (Kewanee Reply Brief, p. 7) is inconsistent with its own undertaking to provide first class workmanship. Kewanee assumed to "be responsible for workmanship" and to assure Burnham that "acceptance does not relieve the fabricator of responsibility for poor workmanship" (Exh. 4).

Kewanee bases its third-party claim primarily on an alleged assumption by Burnham of all testing operations and on the manner in which Burnham conducted the test while the cylinder was in Burnham's exclusive control, namely in an unguarded area where Burnham's employees were passing by. However, each of these propositions has been answered by the jury, the first, by their finding that Kewanee did not relieve itself of workmanship or testing obligations and the second by their answer to the "proximate cause" phase of the court's charge.

After Kewanee had rested its case, Burnham moved to dismiss the third-party complaint on the ground, in substance, that Kewanee was not entitled to judgment over against Burnham for any recovery plaintiff might obtain. The trial court denied that motion. At the close of the entire case this motion was renewed and the court reserved decision. After the jury's verdict Burnham moved to set aside the verdict in favor of Kewanee against Burnham on the ground, amongst others, that the "complaint and cause of action in the main action, the primary action against Kewanee, was founded on the theory and on the allegation, and I think substantiated by the proof, of active negligence on the part of the defendant Kewanee." The court denied both motions.

■ The decision here is governed by the applicable law of the State of New York. Where indemnity or recovery over in a third-party action has been sought, the New York courts have recently had occasion to declare the controlling principles so as to leave little doubt as to their proper application here.

In Edwards v. Sophkirsh Holding Corp., 1st Dept. 1952, 280 App.Div. 168, 112 N.Y.S.2d 219, affirmed 304 N.Y. 850, 109 N.E.2d 717, the plaintiff sued the defendant Sophkirsh, the owner of the premises on which decedent met his death from an electric shock while loading coal. The defendant filed a third-party complaint against decedent's employer, Fairbanks Fuel Corp., alleging that Fairbanks was in charge of the loading operation and hence was solely responsible. The Appellate Division, reversing the lower court, directed the dismissal of the third-party complaint, saying (112 N.Y. S.2d at page 221):

"Plaintiff's complaint here is not predicated upon any responsibility of the owner of the premises apart from active negligence. This is not one of those cases where defendant could be found liable merely as a property owner or for what might be termed passive negligence and be entitled to claim over against a third party whose active negligence was solely responsible for an injury. Plaintiff's complaint alleges negligent maintenance of defective electrical installations and of a resulting dangerous condition. If plaintiff may recover against the defendant, the liability must be one which the defendant is not entitled to call upon the third-party defendant to assume."

The court concluded that "Plaintiff is thus limited by the bill of particulars to recovering on a factual basis which

charges the third-party plaintiff with active negligence only; if those allegations are not sustained, there can be no recovery, but if they are proved to the satisfaction of the trier of the fact, there can be no indemnification of the third-party plaintiff as matter of law."

In Anderson v. Liberty Fast Freight Co., 3rd Dept. 1954, 285 App.Div. 44, 135 N.Y.S.2d 559, the complaint alleged that the defendant's truck negligently collided with a car in which the plaintiff was a passenger. The defendant as a third-party plaintiff charged the third-party defendant with responsibility for the accident in that it negligently caused its truck to run into the defendant's truck pushing it into the vehicle in which the plaintiff was riding. The lower court denied the third-party defendant's motion to dismiss the third-party complaint but the Appellate Division reversed, holding (135 N.Y.S.2d at pages 560–561):

"We think a cause over against the third-party defendants is not made out on this pleading. If, as the pleading asserts, the third-party plaintiff's tractor-trailer unit was stopped before the collision and is not found on the trial to have played any part of the negligent causation of the accident, no recovery in favor of the plaintiff against the third-party plaintiff will be allowed.

"But if a proper verdict is returned for the injured person against the third-party plaintiff, i. e., if negligence is found in the operation or control of its tractor-trailer, in the present condition of the New York law such a liability cannot be passed on to any other person who may also have been negligent.

"The area in which a party held liable for negligence may pass that liability on to another negligent party is closely circumscribed. It encompasses a group of special situations and relationships where it has seemed reasonable to impose an ultimate responsibility on a party seen to have played the active role in the negligence situation in favor of one who is made answerable to the injured party, but whose part in the event is passive or arises from the effect of public policy, contract or status."

Even more recently the New York Court of Appeals has had occasion to state the law with respect to indemnity in negligence cases in Harrington v. 615 West Corp., 1957, 2 N.Y.2d 476, 161 N.Y.S.2d 106, 141 N.E.2d 602, and Inman v. Binghamton Housing Authority, 1957, 3 N.Y.2d 137, 164 N.Y.S.2d 699, 143 N.E. 2d 895, 59 A.L.R.2d 1072. In Harrington the plaintiff tripped over a rope on the roof of an apartment house owned by the defendant, 615 West Corp. The plaintiff sued both the owner and Starlight Painting Company which had installed the ropes to support scaffolds used in painting the building. The trial court gave judgment in the plaintiff's favor against both defendants and dismissed the cross complaint of 615 West Corp. against the Painting Company. The Appellate Division reversed this dismissal and directed judgment in favor of 615 West Corp. on the cross complaint. The New York Court of Appeals reversed the indemnity judgment, holding that "This is not a case which brings into play the rule of active and passive negligence between codefendants" (citing cases) (2 N.Y.2d at page 483, 161 N.Y.S.2d at page 110, 141 N.E.2d at page 605). The court found that a primary duty rested upon each defendant, saying "The duty of exercising reasonable care to erect warning signs or barriers was primary in the case of the landlord as well as of the contractor. In both instances it consisted in the omission to take these precautions, and, under these circumstances, the negligence of each is active negligence."

In Inman v. Binghamton Housing Authority, 1957, 3 N.Y.2d 137, 164 N.Y.S.2d 699, 143 N.E.2d 895, 59 A.L.R.2d 1072, plaintiff, an infant, was injured by falling from a stoop of an apartment house. Two suits were brought, one against the Housing Authority and the other against the architects and builder. The Housing Authority in its action served a third-

party complaint against the architects and builder claiming a right to indemnity in the event of any recovery against it. The plaintiff's complaint listed three alleged defects as a basis for the assertion of negligence: (1) absence of a protective railing; (2) the manner in which the door opened outward to the stoop; and (3) the inadequacy and improper placement of the step from the stoop to the sidewalk. The builder and the architects moved to dismiss the third-party complaint. The motion was granted at Special Term but reversed by the Appellate Division. The New York Court of Appeals in turn reversed and dismissed the third-party complaint. The Housing Authority had argued that it was only passively negligent whereas the architects and builder were actively negligent. The court held that since the plaintiff's complaint alleged negligence in the construction, maintenance and continuance of an allegedly known defective condition of the premises "the Authority is cast 'in the role of an active tort-feasor, and as such, is not in a position to compel * * * indemnification * * * absent an agreement so to do'" (3 N.Y.2d at pages 146–147, 164 N.Y.S.2d at page 705, 143 N.E.2d at page 900).

In Miller v. Pennsylvania Railroad Company, 2 Cir., 1956, 236 F.2d 295, 297, an employee of Allen N. Spooner, Inc., was injured by an electric flash while working in proximity to high tension wires on a building owned by Pennsylvania. The plaintiff sued Pennsylvania, claiming negligence in maintenance; Pennsylvania by a third-party action sought indemnity against Spooner in the event the plaintiff recovered. Pennsylvania settled with the plaintiff and the third-party claim was tried without a jury. The trial court found that Pennsylvania was negligent in allowing dust and metal particles to accumulate on the insulators thus permitting the short circuit and the flash. Finding that Pennsylvania's negligence was the proximate cause of the accident, it refused to award indemnity against Spooner. The trial court also found that Spooner was free from negligence. On this point, this court held that "[E]ven if Spooner was negligent Pennsylvania's negligence in maintaining the equipment would bar it from recovering indemnity" and that under New York law which was controlling in a diversity case it was "quite clear that a party guilty of active negligence has no right of indemnity against another whose concurrent negligence contributed to the injury." This court said "To the extent that the accident resulted from a failure of the electrical equipment it was the consequence of Pennsylvania's own active negligence." Referring to the contention that under its contract with Pennsylvania, Spooner had agreed to indemnify Pennsylvania the court said: "Under New York law a person is not entitled to be indemnified against a liability to which his own active negligence contributed unless the contract expresses that intention beyond all doubt. * * * Even though Spooner may have had a duty to take precautions to protect its employees from injury, the contract provides no basis for imposing upon it the primary responsibility for correcting or protecting against a defective condition in equipment maintained by Pennsylvania" (236 F.2d 295, 298).

▮ Applying the law of New York as gleaned from these cases to the facts of this case it is at once apparent that the only claim asserted by plaintiff is for the negligence of Kewanee. This negligence does not arise by operation of law as in the landlord type of case but because "they failed and neglected to use proper and adequate materials and methods in the welding work upon the metal head of said 'boiler.'" This is a charge of active negligence and as put to the jury in the court's instructions the only type of negligence for which plaintiff could recover. Nor is there to be found in the complaint any allegation that Burnham was responsible for or connected with the negligence attributed to Kewanee. Under New York law, therefore, Kewanee cannot recover against Burnham on the theory of indemnity by operation of law or on any theory of passive-active negligence. In fact, had Burnham moved to dismiss on the third-party complaint under the de-

cisions in Edwards, Anderson, Harrington and Inman, supra, the motion should have been granted.

This leaves only the question whether any issue remains between Kewanee and Burnham based upon the third-party complaint. In that complaint Kewanee alleged that Burnham undertook to perform tests at Burnham's factory and that Kewanee relied upon Burnham to make a proper test with adequate safeguards. Kewanee then alleged that decedent's death was caused solely and exclusively by Burnham's negligence in conducting the test. No agreement by Burnham to indemnify Kewanee is pleaded. No such agreement was offered upon the trial.

■■ The law of New York requires that an indemnity agreement be expressed in unequivocal terms and be strictly construed. In Inman, supra, the New York Court of Appeals said (3 N.Y.2d at page 148, 164 N.Y.S.2d at page 707, 143 N.E.2d at page 901):

> "Moreover, and in any event, the agreement 'will not be construed to indemnify a person [here, the Authority] against his own negligence unless such intention is pressed in unequivocal terms.' (Thompson-Starrett Co. v. Otis Elevator Co., supra, 271 N.Y. 36, 41, 2 N.E.2d 35, 37; see, also, Dick v. Sunbright Steam Laundry Corp., supra, 307 N.Y. 422, 425, 121 N.E.2d 399, 401.) Concededly, there was no such unequivocal expression in the contract before us."

Although the trial court posed the question as to whether Burnham by its contractual arrangement with Kewanee undertook the obligation to indemnify it for injuries caused during the test, no instructions concerning the requisites for recovery under the New York law were given to the jury and no requests made therefor by Kewanee. Nor was there any proof which would have supported such a charge.

Judgment in favor of plaintiff against Kewanee affirmed; judgment in favor of Kewanee against Burnham reversed and third-party complaint dismissed.