Francis T. RATIGAN, Appellee,

v.

NEW YORK CENTRAL RAILROAD CO., Appellant,

v.

INTERSTATE COMMODITIES, INC., Appellee, and

The Troy Union Railroad Company, Appellee-Appellant.

No. 300, Docket 26217.

United States Court of Appeals Second Circuit.

Argued April 13, 1961.

Decided June 5, 1961.

1. 28 U.S.C.A. rule 41(b).

J. Murray Dunn, Syracuse, N. Y. (McElroy, Young, Martin & Dunn, Syracuse, N. Y., on the brief), for appellee Francis T. Ratigan.

Earl G. Gallup, Jr., Albany, N. Y. (Whalen, McNamee, Creble & Nichols, Albany, N. Y., on the brief), for appellant.

M. James Conboy, Albany, N. Y. (Edward L. Bookstein, James S. Carter, John W. Cebula, James M. Conboy and Carter & Conboy, Albany, N. Y., on the brief), for appellee Interstate Commodities, Inc.

Jerome H. Shapiro, New York City (Gerald E. Dwyer, New York City, on the brief), for appellee-appellant The Troy Union Railroad Company.

Before CLARK, MEDINA and FRIENDLY, Circuit Judges.

MEDINA, Circuit Judge.

On October 23, 1957 at about 3 A.M., Francis T. Ratigan, a brakeman employed by New York Central Railroad Company, was struck by an overhanging canopy on premises owned by Interstate Commodities, Inc. as he was about to descend from the top of a freight car to operate the brake and bring the car to a standstill. In his action against New York Central a verdict of $70,000.00 was rendered in his favor and the New York Central appeals. In its answer the New York Central asserted three cross-claims: (1) against Interstate for recovery over on the theory that Interstate was guilty of active negligence in the construction of the canopy in such manner that it projected over the rails of the track, whereas the negligence of New York Central was at most passive only; (2) against Interstate for indemnity pursuant to a contract between Interstate's assignor and Troy Union Railroad Company the terms of which had been made binding on Interstate, on the theory that New York Central and its employees were beneficiaries of the contract, although not named therein; and (3) against Troy Union, in the event of the rejection of the other cross-claims, on the theory that Troy Union was acting as New York Central's agent and was under a duty to require Interstate to include in the contract indemnity to New York Central and its employees for damage suffered by breach of the terms of the contract relative to the construction of overhanging canopies. These claims were all dismissed by the trial judge and New York Central appeals from the judgment of dismissal. By way of protection, in the event of a reversal of so much of the judgment as dismisses the cross-claim against it, Troy Union also appeals in support of a cross-claim of its own against Interstate, for indemnity under the contract if New York Central should recover against it. Judge Foley's opinion is reported at 181 F.Supp. 228.

The factual background is far from complicated and each of the several separate issues is simple enough. The principal difficulty has its source in the answers of the jury to a series of questions formulated by the trial judge as the basis for a special verdict under Rule 49(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. For the sake of clarity we shall first discuss together the claim of Ratigan against the New York Central, based upon active as well as passive negligence, and the first cross-claim of New York Central against Interstate whose negligence in the construction of the overhanging canopy would seem clearly to be active, under the law of New York which controls the substantive features of the cross-claims. Later, we shall come to the second and third cross-claims and they will not detain us long.

The scene of the accident is the siding adjacent to the Interstate property where

freight cars were loaded and unloaded with merchandise coming to or going from the Interstate premises. Alongside the siding was the main Troy yard with its several tracks. Ratigan worked on the midnight to eight A.M. shift and there were five men in the crew, a conductor Bazar, an engineer, a fireman and two brakemen, one of whom was Ratigan. As these five men were riding the engine and approaching the switch leading to the Interstate siding there was a freight car attached to the rear end of the engine and there were five or six other freight cars on the siding. The instructions given by the yardmaster to the conductor, who was in charge of the operation, were to put the freight car that was attached to the engine up at the end of the siding furthest away from the switch, what Ratigan called "the hind end of the track," and then place the other cars at various locations on the siding convenient to the Interstate doors where the loading or unloading was to take place. This made it necessary first to pull out the five or six cars already on the siding, take them to the adjacent main track and leave them there, after which the one freight car already attached to the engine could be placed in its intended position at the further end of the siding. It was the duty of Lasky, the other brakeman, to stay near the engine and tend the switch; Ratigan was to pass signals along between Bazar and the engineer. The men were used to working together but the man in charge was definitely Bazar.

The first thing they did was to open the switch and back down into the siding where they coupled the five or six freight cars to each other and to the single car already attached to the engine. Then the engine and the string of freight cars were brought up past the switch and the five or six cars "kicked" up the main track. There was a slight grade running in the direction of the engine. Bazar testified he told Ratigan "to watch the cars so they would not roll back," and Ratigan put a block of wood under the one nearest the engine as they came to a stop. Ratigan signalled when they were clear of the switch and Bazar signalled to the engineer to "kick" the one car "back into the siding" and Lasky threw the switch. The men had lanterns and all the signals were given by moving these lanterns in various ways.

As we approach the critical moment Ratigan is at least six car lengths or 250 feet away from the engine, according to Bazar, and he gets no instructions whatever from Bazar, who, without communicating in any way with Ratigan, has decided that he will himself take care of braking the single freight car as it proceeds up the siding at about four miles an hour. Accordingly, Bazar, who was on the freight car when it was "kicked" off, remained on the freight car. The brake which operated as a wheel attached to the end of the car was at Bazar's end. So Bazar started to wind up the brake in a crouching position with his lantern on the brake step where Ratigan could not see it. In the meantime, not receiving any instructions from Bazar and assuming that he was supposed to brake the car, Ratigan boarded the moving car at the other end, climbed up to the top, walked along the catwalk on top of the car, and was on his hands and knees, reaching down for the ladder with his left foot, having placed his lantern on top of the car, when he was hit in the head by the end of the projecting canopy and thrown to the ground. Bazar did not know Ratigan was there until the very moment of the accident and he did not expect Ratigan to be there. And the same can be said the other way around, Ratigan did not expect Bazar to be where he was and he said he had no reason to expect him to be there. And all this was in darkness, although the men accustomed to this work could see well enough to get around.

There is also evidence, but not much, from which the inference might be drawn by the jury that the proper way to bring a single car into position on the siding was to keep it attached to the engine rather than to "kick" it in. Thus Bazar testified that if this single freight

car was the only one to be put in the siding the proper way to do it was to back it in coupled to the engine. While he insisted this method was not to be used when there were several other freight cars to be put on the siding later, the jury may have rejected this qualification, especially as one of the Interstate officials testified he had repeatedly seen single cars backed into the siding attached to the engine and had never seen an instance where one was "kicked" in.

Had the action been brought by Ratigan against Interstate we have no doubt the jury would have found in Ratigan's favor, on this record. And this is so, quite apart from the specific terms of the sidetrack agreement of March 8, 1937 between Interstate's assignor and Troy Union, which requires industry to keep the "track clear of obstructions" and prohibits any temporary or permanent structures "within the space of 8 feet, 4 inches on either side of the center line of said track, or within the space of 22 feet above the said track."

But Ratigan did not sue Interstate, and his claim against New York Central was based upon two counts: (1) that the railroad knew or should have known of the existence of this canopy and was under a duty to cause it to be removed, or at least to warn its employees of the danger; and (2) that the operation of placing the single freight car in the siding was conducted in a negligent manner. While Bazar and Ratigan testified that they had never noticed this particular canopy before and counsel for the railroad claimed the photographs showed it had been erected shortly before the accident, we do not get this impression from the exhibits and there is positive and very convincing proof that the canopy was erected by Interstate in July, 1955. In view of the proof of constant use of this siding by New York Central, we think the jury had little difficulty with the first count, despite the testimony of Bazar and Ratigan that they had never noticed the canopy until the time it hit Ratigan in the head.

The case of Ratigan against the railroad was submitted to the jury with instructions covering both counts, and, as will later appear, the jury found there was negligence both by failure to cause the obstruction to be removed or to warn the men, and also in the manner of conducting the switching operation itself, and that in each instance the negligence or breach of duty was a proximate cause of the injuries to Ratigan.

### New York Central's Appeal as Against Ratigan

Conceding that there was sufficient evidence of negligence to support the verdict against the railroad on the first count, the New York Central seeks a reversal as against Ratigan on two grounds: (1) that there was not sufficient evidence to sustain a finding of negligence in the manner in which the switching operation was conducted, as charged in the second count, and that the verdict should not be allowed to stand unless supported by proper proof on both counts; and (2) that it was error to refuse a request for an instruction to the jury "that conductor Bazar's presence on the ladder was not a proximate cause of this accident."

But for the alleged inconsistency in some of the answers to the questions formulated by the trial judge, which we shall discuss later, we could dispose of the first contention by merely stating that the jury made a specific finding against the railroad on both counts. In addition, however, we hold the evidence sufficient to establish negligence by the railroad on both counts.

The instructions in chief and certain supplementary instructions in response to a question from the jury after the commencement of its deliberations, indicated that in deciding whether there was negligence in the method of operation by which the single car was moved to its destination, the jury were to consider "all human and mechanical activities that were involved." They might have concluded that the single car should not have

been "kicked" back into the siding but backed in coupled to the engine. They might also have concluded that it was the duty of Bazar to inform Ratigan that Bazar would himself brake the car and that Ratigan should keep off. Bazar was in complete charge of the operation and he knew that it was not necessary to have two men on the car to operate the brake. The confusion or, as the trial judge expressed it in his opinion on the motion for a new trial, "the fumbling of instructions," might very properly be considered by the jury to constitute negligence and a proximate cause of the accident. Had Ratigan been told that Bazar would himself brake the car Ratigan would not have boarded it. Moreover, had Bazar not already commenced to wind the brake wheel and thus to some extent to arrest the forward motion of the car, the jury might well have inferred that the car would have otherwise been well past the canopy by the time Ratigan had reached his crouching position in his attempt to reach the brake and operate it.

■ The law applicable to this phase of the case is federal law and the Supreme Court has told us in various ways and on numerous occasions that in these FELA cases the railroad employee is to be given the benefit of every doubt. E.g., Harris v. Pennsylvania R. R., 1959, 361 U.S. 15, 80 S.Ct. 22, 4 L.Ed.2d 1; Moore v. Terminal R. R. Ass'n, 1958, 358 U.S. 31, 79 S.Ct. 2, 3 L.Ed.2d 24; Honeycutt v. Wabash Ry., 1958, 355 U.S. 424, 78 S.Ct. 393, 2 L.Ed.2d 380; Stinson v. Atlantic Coast Line R. R., 1957, 355 U.S. 62, 78 S.Ct. 136, 2 L.Ed.2d 93; Gibson v. Thompson, 1957, 355 U.S. 18, 78 S.Ct. 2, 2 L.Ed.2d 1; Ringhiser v. Chesapeake & Ohio Ry., 1957, 354 U.S. 901, 77 S.Ct. 1093, 1 L.Ed.2d 1268; McBride v. Toledo Terminal R. R., 1957, 354 U.S. 517, 77 S.Ct. 1398, 1 L.Ed.2d 1534; Arnold v. Panhandle & Santa Fe Ry., 1957, 353 U.S. 360, 77 S.Ct. 840, 1 L.Ed.2d 889; Rogers v. Missouri Pacific R. R., 1957, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493; Cahill v. New York, N. H. & H. R. R., 1955, 350 U.S. 898, 76 S.Ct. 180, 100 L.Ed. 790; O'Neill v. Baltimore & Ohio R. R., 1955, 348 U.S. 956, 75 S.Ct. 447, 99 L.Ed. 747; Stone v. New York, Chicago & St. L. R. R., 1953, 344 U.S. 407, 73 S.Ct. 358, 97 L.Ed. 441; Wilkerson v. McCarthy, 1949, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497.

■ The request to charge was misleading and unnecessary. It was properly refused. We cannot perceive how the jury could have thought the mere presence of Bazar on his end of the car was a proximate cause of the accident, and we can draw no inference from the summations as they were not reported and are not before us. It was not only what Bazar did, including the operation of the brake and the giving of orders to the engineer to "kick" the car up the siding, but what he did not do that may well have been considered by the jury to constitute the negligence of the railroad in the switching operation that they found to be "one of the proximate causes" of the accident. He had not given proper instructions to his crew and had not told any of them that he would himself stay on the car and brake it himself.

Accordingly, we conclude that the judgment in favor of Ratigan against the railroad should be affirmed.

### Active and Passive Negligence and New York Central's First Cross-Claim

■ We now come to the interesting part of the case. The substantive features of the cross-claims are controlled by New York law, but the applicable adjective law is, of course, federal. We think it is clear that negligence of the railroad in the conduct of the switching operation itself would be considered by the New York courts to be active negligence. See Bush Terminal Bldgs. Co. v. Luckenbach Steamship Co., 1961, 9 N.Y. 2d 426, 214 N.Y.S.2d 428, 174 N.E.2d 516; Putvin v. Buffalo Elec. Co., 1959, 5 N.Y.2d 447, 186 N.Y.S.2d 15, 158 N.E.2d 691; McFall v. Compagnie Maritime Belge, 1952, 304 N.Y. 314, 107 N.E.2d 463; Ruping v. Great Atlantic & Pacific Tea Co., 3d Dep't, 1953, 283 App.Div. 204, 126 N.Y.S.2d 687. See also Guarnieri v.

Kewanee-Ross Corp., 2 Cir., 1959, 263 F. 2d 413, modified on other grounds, 2 Cir., 270 F.2d 575. Negligence of the railroad in failing to cause the canopy to be removed or to warn its employees to watch out for it would probably be considered by the New York courts to be either active or passive negligence depending upon whether the railroad actually knew of its existence and position and acquiesced in it, or merely should have known of it. See Putvin v. Buffalo Elec. Co., supra; Ruping v. Great Atlantic & Pacific Tea Co., supra. But the New York courts would beyond peradventure of doubt consider Interstate's construction and maintenance of this dangerous obstruction to be active negligence. See Putvin v. Buffalo Elec. Co., supra. Also, according to New York law, there could be no recovery by way of indemnity by the railroad against Interstate if one of the proximate causes of the accident was the active negligence of the railroad. Tipaldi v. Riverside Memorial Chapel, 1st Dep't, 1948, 273 App.Div. 414, 418, 78 N.Y.S.2d 12, affirmed 298 N.Y. 686, 82 N.E.2d 585; see Putvin v. Buffalo Elec. Co., supra, 5 N.Y.2d at page 455, 186 N.Y.S.2d at page 21, 158 N.E.2d at page 695; Messaro v. Long Island R. R., 2d Dep't, 1948, 274 App.Div. 939, 83 N.Y.S.2d 527.

 Despite the New York ruling that what is active and what is passive negligence is, "generally speaking, a question of fact for the jury," McFall v. Compagnie Maritime Belge, supra, 304 N.Y. at page 328, 107 N.E.2d at page 471, it would have been entirely proper for the trial judge to formulate questions of fact, as he did in this case, leaving it to himself to draw the legal inferences of active and passive negligence. As a matter of federal procedure it was unnecessary and improper also to submit questions containing the conclusions of law to be drawn from the findings of fact. Cf. Thedorf v. Lipsey, 7 Cir., 1956, 237 F.2d 190, 193; Cate v. Good Bros., Inc., 3 Cir., 1950, 181 F.2d 146, 149; 5 Moore, Federal Practice, p. 2204. On the other hand, it would have been proper to submit the case to the jury for a general verdict as was apparently done by the trial court in Banks v. Central Hudson Gas & Elec. Corp., 2 Cir., 1955, 224 F.2d 631. If this course had been pursued, it would have been necessary to explain as succinctly as possible, and with reference to the claims actually made by the parties, the difference between active and passive negligence.

What the trial judge did was to pursue a middle course. The questions formulated, to which no objection was voiced by any of the parties, and the answers given by the jury are as follows:

" '1. Did the erection of the canopy adjacent to door 3 by Interstate constitute negligence? Answer: Yes.

" '2. Was the erection of the canopy one of the causes of the accident? Answer: Yes.

" '3. Did the New York Central Railroad Company know or should it have known of the existence and position of the canopy and its extension over a railroad car previous to October 23, 1957? Answer: Yes.

" '4. If your answer to question "3" is "yes," then was the New York Central Railroad Company negligent in failing to take any steps to bring about removal of the canopy or notify its employees of its existence? Answer: Yes.

" '5. Did the method of operation by which the New York Central Railroad Company moved the car to its destination on the siding constitute negligence? Answer: Yes.

" '6. Was the method of operation by which the New York Central Railroad Company moved the car to its destination on the siding one of the causes of the accident? Answer: Yes.

" '7. Was the New York Central Railroad Company guilty of active or passive negligence, or both? Answer: Passive.

" '8. Was Interstate Commodities, Inc., guilty of active or passive

negligence or both? Answer: Both.'"

■ We think questions 7 and 8 were unnecessary and improper. Having already made the findings of fact in its answers to questions 5 and 6, to the effect that the negligence of the railroad in the method of operation of moving the freight car was "one of the causes of the accident," the jury should have concluded that the railroad was guilty of active negligence. There is a manifest inconsistency between the answers to questions 5 and 6, on the one hand, and the answer to question 7 on the other.

■ On the motion to set aside the verdict and for a new trial Judge Foley in effect held that it was a mistake to submit the legal questions pertaining to active and passive negligence to the jury because these were "difficult legal principles" [181 F.Supp. 232] and they "gave the jury an unnecessary legal workout which was far beyond their comprehension." We agree with this, although we are frank to say that the legal principles involved could have been more clearly stated. Judge Foley also held that, the facts having been determined by the answers to questions 3, 4, 5 and 6, the erroneous legal conclusion stated in the answer to question 7 could be disregarded "as surplusage." We also agree with this ruling, which we think especially admissible in a case where a special verdict is taken under Rule 49(a). In such a case the trial judge reserves a large measure of control over the judgment to be entered, in the interest of substantial justice between the parties. Cf. Momand v. Universal Film Exchange, Inc., D.C.D.Mass.1947, 72 F.Supp. 469, 485; Halprin v. Mora, 3 Cir., 1956, 231 F.2d 197.

Thus we conclude that the judgment dismissing the railroad's first cross-claim against Interstate was proper and that it should be affirmed.

### The Remaining Cross-Claims

When Interstate bought the property on which the canopy was later constructed, it assumed the obligations of its assignor pursuant to the terms of the sidetrack agreement of March 8, 1937 with Troy Union. The agreement made no reference whatever to New York Central or to its employees. Indeed, we are told Interstate knew of no relationship between Troy Union and New York Central nor of such arrangements as existed between the various railroads and Troy Union concerning the use of the Troy Union yard and tracks. The indemnity clause relied upon by New York Central, while in broad terms, runs in favor of Troy Union only.

The basis of the second cross-claim by New York Central is that, as Troy Union owned no engines or rolling stock of any kind, employed no conductors, engineers, foremen or brakemen, and had an arrangement with the New York Central, the Delaware & Hudson and the Boston & Maine, described as operating companies, pursuant to which they pay nothing for the privilege of operating on the Troy Union tracks but share in certain proportions 100% of Troy Union's expenses, therefore, it is argued by New York Central, there is to be implied in the agreement of March 8, 1937 a provision to the effect that New York Central and its employees are to be beneficiaries of the indemnity clause, although not named or referred to therein or elsewhere in the agreement.

The trial judge formulated another question for the jury, in an excess of caution, the purport of which is whether "the agreement or the circumstances surrounding its execution clearly express an intent that the New York Central Railroad Company be entitled to enforce the provisions of the agreement against Interstate." The jury answered "No."

■ We think that on the record before us this was a question of law for the court and we find nothing in the New York cases to warrant a holding that the indemnity clause was intended to benefit the New York Central or its employees. See Beveridge v. New York Elevated R. R., 1889, 112 N.Y. 1, 26, 19 N.E. 489, 2 L.R.A. 648; Skinner Bros. Mfg. Co. v. Shevlin Engineering Co., 1st

Dep't, 1931, 231 App.Div. 656, 248 N.Y.S. 380, affirmed 257 N.Y. 562, 178 N.E. 795. Moreover, Rigney v. New York Central & Hudson River R. R., 1916, 217 N.Y. 31, 111 N.E. 226, and Waterman Steamship Corp. v. Dugan & McNamara, Inc., 1960, 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed. 2d 169, are both clearly distinguishable, and the latter concerns federal law only.

The arguments supporting the third cross-claim against Troy Union for failure to insist upon a broader indemnity clause for the benefit of New York Central and its employees is indeed, as said by Judge Foley, a "clutch at the last straw," and it has no merit whatever.

As all the cross-claims were properly dismissed, we need not concern ourselves with Troy Union's protective cross-appeal.

Affirmed.

FRIENDLY, Circuit Judge (concurring and dissenting).

I join in affirming Ratigan's judgment against the New York Central and the dismissal of the Central's second and third cross-claims, for the reasons stated by Judge MEDINA; as to the Central's first cross-claim I would grant a new trial.

We must assume the jury, which deliberated more than four hours, intended its answers to be consistent. It had been instructed as to the difference between active and passive negligence—perhaps not, as my brother MEDINA observes, with pristine clarity, but in a way to which no one had objected and which sufficiently conveyed a distinction so inherently incapable of precise statement. One thing the jury had been unmistakably told: "The person or corporation guilty of active negligence has been characterized as a primary or principal wrongdoer responsible for his negligent act not only to the person injured, but also to one indirectly harmed by being cast in operation of law for the wrongful act." In the light of that instruction, the jury's answers to questions 7 and 8 reveal rather plainly who it thought should be held.

My brothers say the jury failed to accomplish its purpose because it gave an affirmative answer to question 5: "Did the method of operation by which the New York Central Railroad Company moved the car to its destination on the siding constitute negligence?" If question 5 must be read as limited to such a matter as kicking the car rather than moving it by the engine (and if we further assume there was sufficient evidence of that constituting negligence, which I doubt), the answer would be inconsistent with the answer to question 7 finding the Central guilty of passive negligence alone. But why must it be so read? For all I can see, the jury may have understood the question as including failure to give Ratigan proper notice of the proximity of the canopy, which would be only "passive" negligence if the railroad did not actually know of the canopy but merely ought to have known, McFall v. Compagnie Maritime Belge, 1952, 304 N.Y. 314, 107 N.E.2d 463; Ruping v. Great Atlantic & Pacific Tea Co., 3d Dept.1953, 283 App.Div. 204, 126 N.Y.S. 2d 687; Putvin v. Buffalo Elec. Co., 1959, 5 N.Y.2d 447, 186 N.Y.S.2d 15, 158 N.E. 2d 691. This seems all the more likely in view of the question asked by the jury, after two and a half hours, whether "the phrase 'method of operation' appearing in 5 and 6 cover all human and mechanical activities (including verbal instructions) connected with moving the car to its destination, or is the phrase limited to mechanical operations?", and the judge's response "It is not restricted just to mechanical." On that view, which ought be adopted, if at all possible, in order to reconcile the answers, judgment should have been entered for the Central on its third party claim. If the District Judge was doubtful about this, as he might well have been, the jury could have been asked to clarify what it meant; or if his doubts did not crystallize until later, he could have directed a new trial on the Central's claim against Interstate. But I see no warrant for striking the jury's answers to questions 7 and 8 and then, on the basis of its answer to ques-

tion 5, which, to say the least, is ambiguous, entering a judgment on the cross-claim quite evidently opposed to the result the jury intended and could permissibly have reached on the evidence.

F.R.Civ.Proc. 49(a), which is here applicable, contains no provision for the court's disregarding an answer, in the way that the penultimate sentence of 49(b) permits the court to disregard a general verdict "When the answers [to special interrogatories] are consistent with each other but one or more is inconsistent with the general verdict." The problem under 49(a) is more like that dealt with in the last sentence of 49(b) "When the answers are inconsistent with each other * * *"; there the Rule provides that "the court shall not direct the entry of judgment but may return the jury for further consideration of its answers and verdict or may order a new trial." The evident sense of this is that when the answers are all consistent, a contrary general verdict may be disregarded as an aberration; but when the answers are inconsistent, disregard of any would be a denial of jury trial.

Despite this, my brothers say the answers to questions 7 and 8 may be disregarded because these ought not have been asked in the first place, since, in their view, the two latter questions do not relate to an "issue of fact." Whether Rule 49 uses "fact" in the limited sense which we have held with respect to "findings of fact" in Rule 52(a), see E. F. Drew & Co. v. Reinhard, 2 Cir., 1948, 170 F.2d 679, 683–684 and the cases as to negligence cited in Romero v. Garcia & Diaz, Inc., 2 Cir., 1961, 286 F.2d 347, 355, certiorari denied 1961, 365 U.S. 869, 81 S.Ct. 905, 5 L.Ed.2d 860, or in the broader sense of including mixed questions of law and fact, seems not to have been clearly decided—certainly the district courts in this circuit have not regarded themselves as confined to the former. Although statements in Cate v. Good Bros., Inc., 3 Cir., 1950, 181 F.2d 146, 149, certiorari denied 1950, 340 U.S. 826, 71 S.Ct. 62, 95 L.Ed. 607, and in Thedorf v. Lipsey, 7 Cir., 1956, 237 F.2d

190, 193, cited by Judge Foley and by my brother MEDINA, give some support to the former view, others say that a mixed question of law and fact may be put if the jury is properly instructed on the applicable legal standards, Jackson v. King, 5 Cir., 1955, 223 F.2d 714, 718; McDonnell v. Timmerman, 8 Cir., 1959, 269 F.2d 54, 58; A. M. Webb & Co. v. Robert P. Miller Co., D.C.E.D.Pa.1948, 78 F.Supp. 24, 27, reversed on other grounds, 3 Cir., 1949, 176 F.2d 678; McCandless v. L. G. De Felice & Son, Inc., D.C.W.D.Pa. 1956, 144 F.Supp. 462, 464. If it were necessary here to resolve the issue, I doubt that trial courts should be so hamstrung; to such extent as the device provided in Rule 49 has utility, and cases like this indicate the difficulties its use may create, the court should be able, in a complicated trial, to elicit the jury's view on "ultimate" issues and not merely on evidentiary ones. "The number and form of issues, if they present the case fairly, is a matter resting in the sound discretion of the trial judge." Norfolk Southern Ry. Co. v. Davis Frozen Foods, Inc., 4 Cir., 1952, 195 F.2d 662, 666, second appeal 4 Cir., 1953, 204 F.2d 839, certiorari denied, 1953, 346 U.S. 824, 74 S. Ct. 41, 98 L.Ed. 349. For that matter, if the rule be as narrow as my brothers think, question 5 also is not immune from criticism.

However, we are not required to decide that issue here. The Cate and Thedorf cases held merely that it was not error to submit only issues of fact without instructions as to their legal consequences,—not that a party who has not objected to the submission of a mixed question of fact and law may have a disappointing answer disregarded and judgment entered in his favor as if the question had not been put. Here the jury gave its considered verdict that the Central was not guilty of active negligence and that Interstate was, after having been charged in the clearest terms what the consequences would be. Even if that answer was inconsistent with the answer to question 5, which I do not think it necessarily was, the only proper course,

once the jury was discharged, was to order a new trial; neither the district court nor we are permitted to guess which of the two answers the jury would have altered if the alleged inconsistency had been promptly explained. The ruling of the district judge, now affirmed by my brothers, seems to me to deprive the Central of its right to a jury trial. See Union Pacific R. Co. v. Bridal Veil Lumber Co., 9 Cir., 1955, 219 F.2d 825, 831–832, certiorari denied 1956, 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 849.