Celeste E. **BLOCKSTON** et al., Plaintiffs,

v.

**UNITED STATES** of America, Defendant and Third-Party Plaintiff,

v.

**JOHN C. GRIMBERG CO., Inc.,** and American Hydrotherm Corporation, Third-Party Defendants.

**STATE OF MARYLAND** to the Use of Celeste E. **BLOCKSTON** et al.,

v.

**UNITED STATES** of America, Defendant and Third-Party Plaintiff,

v.

**JOHN C. GRIMBERG CO., Inc.,** and American Hydrotherm Corporation, Third-Party Defendants.

Civ. No. 13855.

United States District Court
D. Maryland.

Jan. 4, 1968.

Thomas J. Kenney, U. S. Atty., Baltimore, Md., and William A. Gershuny, Atty., Dept. of Justice, Washington, D. C., for the United States.

Michael P. Crocker, Baltimore, Md., for American Hydrotherm Corp.

THOMSEN, Chief Judge.

The original complaint in this action was filed against the government to recover damages for the injury to and

death of James W. Blockston, who had sustained the injuries which caused his death while participating in a hydrostatic test of a high-temperature water system at the Patuxent Naval Air Station in the course of his employment by John C. Grimberg Co., Inc. (Grimberg).

The government filed a third-party complaint against Grimberg for indemnity, and a third-party complaint against American Hydrotherm Corporation (Hydrotherm), claiming indemnity and contribution.

Plaintiffs' claim against the government and the government's claim against Grimberg have been settled, and the settlement has been approved by Judge Winter, pursuant to 28 U.S.C.A. § 2677. The government has formally abandoned its third-party claim against Hydrotherm for contribution. The third-party claim of the government against Hydrotherm for indemnity is now before the court.

The government alleges two bases for that claim:

(A) In tort, based upon the alleged negligence of Hydrotherm in its performance of an engineering contract between Hydrotherm and the government, under which Hydrotherm undertook to do certain engineering work and to prepare the specifications and other provisions of the construction contract which Grimberg was performing at the time Blockston was injured. The government contends that Hydrotherm's negligence was active and primary, and that the government's negligence was secondary and passive; and

(B) In contract, based upon an alleged implied agreement by Hydrotherm to indemnify the government.

The government has presented its evidence to the court without a jury. Hydrotherm has filed: (1) a motion to dismiss under Rule 41(b) and (c), F.R.Civ. P., on the ground that upon the facts and the law the government, as third-party plaintiff, has shown no right to relief against Hydrotherm, and (2) a motion for summary judgment under Rule 56 (b), referring to certain admissions by the government, answers to interrogatories, and additional portions of depositions, as well as to the evidence offered by the government. Those motions must be disposed of before Hydrotherm may be required to present any evidence.

■ The government contends that a motion for summary judgment is not proper at this stage of the case. In reply, Hydrotherm cites a number of authorities giving effect to the provision in Rule 56 that a motion for summary judgment may be filed "at any time". See Rotberg v. Dodwell, 152 F.2d 100 (2 Cir., Clark, J., 1945); Burnham Chemical Co. v. Borax Consolidated, 170 F.2d 569 (9 Cir., 1948). Although unusual, a summary judgment at this time is not improper. The dispute is not important in this case, because, for the reasons stated in this opinion, the court has concluded that Hydrotherm's motion under Rule 41(b) and (c) should be granted, and that it is not necessary to consider the additional material filed with the motion for summary judgment.

### The Facts as They Appear from the Government's Evidence.

*Plaintiffs' Complaint.* On June 1, 1962, plaintiffs filed their complaint against the United States under the Federal Tort Claims Act to recover damages for the injury to and death of James Wesley Blockston. It was alleged in the complaint that Blockston was injured on September 20, 1961, at Patuxent Naval Air Station in Maryland, while working as a steamfitter for John C. Grimberg Company; that Grimberg had entered into a contract with the Department of the Navy (NBY 25061), under which Grimberg was constructing and altering a high-temperature water system at the Air Station; that by Paragraph 15.21 of the Contract Specifications (see note 6, below), Grimberg was directed to remove and relocate an existing 12-inch strainer in the high-temperature water system, and thereafter pursuant to Paragraph 15.28.1 (see note 6) to subject the strainer and the other parts of the system to a hydrostatic pressure test of 600 psi; that during said test, while the system was subjected to a pressure

between 500 and 600 psi, and while Blockston acting carefully and prudently was engaged with others in checking for leaks in the system and strainer, the strainer and its cover plate ruptured, causing Blockston to be struck by escaping water and to be thrown violently to the ground from a scaffolding, resulting in injuries from which he died two days later.

Paragraph 7 of the complaint sets forth the allegations with respect to the government's negligence. In substance, plaintiffs allege that the government knew or should have known that the 12-inch strainer was constructed of cast grey iron, and was designed to be subjected to a maximum hydrostatic pressure of 300 psi;[1] and that with knowledge of such facts the government was negligent in its duty to Blockston: in the preparation of the construction contract (NBY 25061) and specifications which required the relocation and re-use of the 12-inch strainer and a hydrostatic test at pressures in excess of those for which it was manufactured, designed and intended to be used; in failing to warn Blockston of the danger inherent in working around the strainer while under such excessive test pressures; in failing to exercise due care and caution to determine that the strainer would not fail or rupture while subjected to those pressures required under the construction contract with Grimberg; and by such negligence on the part of the government, its agents, servants and employees, the government caused or created an unreasonable risk of harm to Blockston, of which he in the exercise of reasonable care and caution was not aware, and failed to provide Blockston with a reasonably safe place to work.

*Other Pleadings.* The government answered plaintiffs' complaint and filed a third-party complaint against Hydrotherm for indemnity and contribution and against Grimberg for indemnity only (since a claim for contribution would have been barred by the Workmen's Compensation Act). Plaintiffs did not amend their complaint to claim against Hydrotherm.

*The Pretrial Order.* Plaintiffs' contentions were elaborated at a pretrial conference held on April 27, 1965.[2] In its Pretrial Order of April 27, 1965, the

1. The complaint alleges: "all of which was known or should have been to the defendant, its contracting officers, agents, servants, and employees by virtue of contract documents, specifications, drawings, samples and other data furnished to the defendant's contracting officers, agents, servants and employees at the time of the original installation of said 12 inch strainer in the water system at Patuxent Naval Air Station on or about the year 1956, under a contract between the Department of the Navy, Bureau of Yards and Docks, United States of America and a contractor other than John C. Grimberg Company, Inc."

2. Counsel for plaintiffs stated, in pertinent part, as follows:

"It is plaintiffs' position that the Government was negligent in requiring under the plans and specifications * * * that a certain 12-inch strainer be removed from the then existing system and reinstalled in the new system which was being worked upon by the John C. Grimberg Company, in that the Government had actual knowledge or was charged with knowledge, by reason of information which it had in its files or which was available to it, that this strainer was inadequate for the test pressure * * *. It is also the plaintiff's position that the Government * * * was negligent in ordering this strainer to be installed in the new system and to be tested at the pressure at which it was being tested at the time of the accident, because the Government should have had or did have actual knowledge that certain dangers were created by the re-use of this strainer and/or its testing * * *.

"It is plaintiffs' position that by virtue of the language in the contract, and particularly that language in Paragraph 15.21 of the contract, when read in context with the other language in the contract, constituted representations of fact and opinion to the Grimberg Company and, in turn, its employees as to the adequacy of this strainer and the uses for which it was proper in the new system and the test pressures at which it could be safely tested.

"We are also relying on the specific contract language as part of our proof of negligence on the part of the Gov-

court severed the trial of the government's third-party claim against Hydrotherm and concluded:

" * * * that the findings of fact in the original suit will be binding upon the jury in the action against American Hydrotherm to the extent, but only to the extent that such facts are required to be found to adjudicate fully the issues between the plaintiffs and the United States."

The Pretrial Order also provided:

"Counsel for American Hydrotherm states that not having filed an answer to the plaintiffs' complaint, he does not claim, nor does he wish to exercise, any right to participate in the action between the plaintiffs and the United States in the examination of witnesses, making argument or presenting affirmative evidence of his own, notwithstanding that the Court would afford him such right."

*The Settlement.* On May 17, 1965, when the case was called for trial, a settlement of plaintiffs' claim against the government and the government's claim against Grimberg was reached. It was agreed that plaintiffs should receive $72,900, of which $22,500 was to be paid by Grimberg and $50,400 by the United States. Following a hearing, the court approved the proposed settlement,[3] which was later embodied in an order reciting specifically the terms of the settlement.

Counsel for American Hydrotherm was present in the courtroom during this hearing, heard the proceedings, responded to a single question put to him by the court, but took no part in the settlement proceedings then before the court.

The "Order Approving Compromise Settlement", which was the only written document embodying the terms of the settlement, was signed by Judge Winter after approval by the attorneys for the plaintiffs and the attorneys for the government.[4] The settlement was consummated in accordance with the order, but did not include a release of any claim

---

ernment in the other respects that I have previously stated."

3. Judge Winter said, in pertinent part:
"I approve this settlement. I have had a little bit more association with this case than a number of federal tort claims cases where I have approved other settlements because this case has been specially assigned to me, at least since the time that American Hydrotherm Corporation was joined as a third-party defendant, and as the record and the court file will show, there have been quite a number of hearings on various discovery motions.

"There has also been a rather extended pretrial conference. My recollection is that it lasted the best part of a single day and part of the proceedings there were transcribed.

"So that even aside from the question of damages, I think I have some notion of the disputed question of liability which exists between the plaintiffs, on the one hand, and the United States, as defendant, on the other.

"It seems to me that the agreement which was entered into by the parties through their counsel and with the approval of Mrs. Blockston is a fair and reasonable settlement of this disputed question of liability and the damages which Mrs. Blockston, should the case

be tried, would undertake to prove. (Gov't Exh. 4; Doc. 155)."

4. The order provided, in pertinent part, after reciting the payments to be made to plaintiffs:
"2. That the defendant, the United States of America, will pay to the plaintiffs the sum of Fifty Thousand Four Hundred Dollars ($50,400), and the defendant, John C. Grimberg Co., Inc., or its insurer, will pay to the plaintiffs the sum of Twenty-Two Thousand Five Hundred Dollars ($22,500), which sums shall be paid into the Registry of the Court and which sums shall be in full settlement and satisfaction of any and all claims said plaintiffs now have or may hereafter acquire against the defendant on account of the incident or circumstances giving rise to this suit.

"3. That the plaintiffs hereby agree to accept said sums in full settlement and satisfaction of any and all claims and demands which they or their heirs, executors, administrators, or assigns may have against the defendant, the United States of America, and its agents and employees on account of the incident or circumstances giving rise to this suit, namely, the accident which occurred at the Naval Air Station, Patuxent River, in the State of Mary-

plaintiffs might have against Hydrotherm.[5]

*The Engineering Contract between the Government and Hydrotherm.* By Contract No. NBY 25031, dated June 30, 1959, Hydrotherm had contracted with the United States to perform architectural and engineering services in connection with certain contemplated modifications to the existing heating system at the Naval Air Station, Patuxent River, Maryland, in two phases. The "First Phase" included "an engineering investigation of the existing High Temperature Water system design, its functional adequacy with respect to existing and proposed heating loads and economy of operation incorporated in a report detailing recommended system modifications if any, number, type and capacity of components required and construction cost estimate". It was agreed, inter alia: "The use of existing stacks and other equipment shall be investigated giving due consideration to age and condition of existing equipment, its expected future life and maintenance, operating and replacement cost, and such other factors as may be pertinent". The "Second Phase" consisted of "the preparation of contract drawings and specifications".

The contract required that Hydrotherm submit to the Navy, for review, drafts of its report of investigation and recommendations, as well as the specifications. Hydrotherm was obligated to "make all required changes or corrections in the specifications". The contract also provided:

"(b) The Contractor shall, if necessary, visit the site and shall hold such conferences with representatives of the Government and take such other action as may be necessary to obtain the data upon which to develop the design and preliminary sketches showing the contemplated project.

" *  *  *  *  *  *

"All services to be rendered hereunder shall be subject to the direction and approval of the Officer-in-Charge. Approval by the Officer-in-Charge of drawings, designs, specifications and other incidental architectural-engineering work or materials furnished hereunder shall not in any way relieve the Contractor of responsibility for the technical adequacy of the work."

Following a conference with the Navy Department concerning the scope of the work to be performed by Hydrotherm, its project manager prepared and signed a memorandum which acknowledged the understanding of the parties that the Area Public Works Officer, Chesapeake,

land, on September 19, 1961, and as a result of which the plaintiffs' decedent, James Wesley Blockston, died.

"4. That in exchange for the payment of the sums stated above and contemporaneous with the delivery of the checks to the Registry of the Court and made payable to the Clerk of the Court, plaintiffs will file with the Clerk of the above Court a dismissal of the above action with prejudice and without costs.

" *  *  *  *  *

"That this settlement agreement is made subject to the approval of the Court as provided in 28 USC 2677.

"Said settlement agreement having been made subject to the approval of this Court, it is hereby approved pursuant to the provisions of 28 USC 2677, and, it is

" *  *  *  *  *

"FURTHER ORDERED, that the plaintiffs' action stand DISMISSED WITH PREJUDICE and without costs upon payment into the Registry of the Court by the defendants of the amounts stated and it is,

"FURTHER ORDERED, that the settlement herein described and the subject of this Order shall in no way affect the claim of the United States of America, Third Party Plaintiff, versus American Hydrotherm Corporation, Third Party Defendant, which claim shall remain open at the above civil number for further disposition, * * *."

5. Such a release would be important in connection with a claim for contribution, which would be governed by Maryland law. See Art. 50, sec. 17(c) of the Annotated Code of Md., 1957 ed., 1964 Repl.Vol.; United States v. Yellow Cab Co., 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1950); Zaccari v. United States, 144 F.Supp. 860 (D.Md., 1956). As noted above, however, the government has abandoned its claim for contribution.

was to exercise full control over the project, but that the final recommendations of Hydrotherm would be based on good engineering practice and would be the sole responsibility of Hydrotherm.

*Performance of the Engineering Contract by Hydrotherm.* The evidence offered by the government shows that Hydrotherm prepared the specifications for the construction contract, including Paragraphs 15.21 and 15.28.1,[6] referred to in the Discussion.

Cautionary language was inserted in other sections of the specifications, namely, sections 15.17.3.3, 15.20.1.4,[7] dealing with items other than the strainer, to insure that components of the existing system that were to be reused would be suitable for the new system, which would operate at higher pressures. No similar cautionary language was included in the section dealing with the 12 inch strainer.

Hydrotherm had not examined that 12 inch strainer or taken any other action to ascertain whether the strainer was steel or cast iron. The shop drawing for that strainer was at all relevant times located in the Area Public Works Office at the Air Station, in a file cabinet containing the construction contract for the original installation in 1956, but no representative of Hydrotherm and no government engineer examined that file.

A number of government engineers reviewed and approved the specifications, after making some changes therein.

*The Construction Contract between Grimberg and the Government.* The construction contract included the specifications set out in notes 6 and 7. It also contained a requirement that Grimberg comply with all pertinent provisions of the publication "General Safety Requirements", EM 385–1–1, prepared by the Corps of Engineers, U. S. Army, which provided in pertinent part:

"19–9. Repairs shall not be made while pressure vessel is under pressure."

"20–21. * * * platforms, elevated work surfaces * * * of 6 feet in height or more above the adjoining surface shall be effectively guarded as follows:

"a. Guard rails of such height and stability as the nature of the work being performed, or contemplated use, may require (wooden guard rails shall be rigidly supported at intervals not greater than 8 feet). The height may vary from 36 to 42 inches and intermediate rails shall be provided."

6. Paragraph 15.21 of the Specification for the construction contract read, in pertinent part, as follows:

"*Strainers* shall conform to specification MIL–S–16293D, Type I or II as required. * * * The aforementioned specification shall apply to steam, condensate, air, oil, and low pressure water services. All other strainers for high temperature water and water services for pressures in excess of 300 psig shall be forged or cast steel 400 lb. ASA rating with end connections as indicated. They shall be 'Y' pattern with stainless steel baskets, $\frac{1}{32}$ inch perforations aggregating in area at least three times the cross section area of the pipe line in which it is installed. * * *".

Paragraph 15.28.1 read:

"*Hydrostatic test.*—The entire system shall then be filled with treated water from the water softeners and subjected to a hydrostatic test of 600 psi for a sufficient time for complete inspection. * * * No component part of the Central Heating Plant may be excluded from the hydrostatic test if that part is normally subjected to operating pressures. * * *"

7. Paragraph 15.17.3.3 of the specifications read:

"Existing piping indicated to be removed shall not be reused. Piping indicated to remain shall be inspected and if found defective, reported to the officer-in-charge. It shall be replaced with new material as hereinbefore specified, by a negotiated change order."

Paragraph 15.20.1.4 read:

"*Existing valves.*—Existing valves may be reused where so indicated provided that the valves are in accordance with these specifications. The contractor shall report any deviation to the officer in charge and install new gear operator if so directed by a negotiated change order. * * *"

The contract also included a provision that the contractor (Grimberg) "shall be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work".

*Performance of the Construction Contract by Grimberg.* The 12 inch strainer was relocated by Grimberg where the specifications required it to be located. Grimberg made no test of the strainer before beginning the hydrostatic test. During the test, when the pressure had risen above 550 psi, Blockston undertook to tighten the cover flange of the 12 inch strainer. That was a dangerous thing to do while the system was being tested, and was the immediate cause of his injury. It was prohibited by Paragraph 19–9 of the Safety Manual, quoted above. It does not appear from the evidence that Grimberg had ever warned Blockston of the danger of such an act (Grimberg admitted that no such warning had been given), nor does it appear whether a man with Blockston's experience should have known that tightening the cover flange under those circumstances was dangerous.

Obedient to Paragraph 20–21 of the Safety Manual, quoted above, Grimberg should have constructed a railing around the platform on which Blockston was working. Such a railing might well have prevented or broken his fall to the ground, which caused his death.

### Discussion

The government is basing its claim against Hydrotherm for indemnity (A) upon alleged primary and active negligence on the part of Hydrotherm in calling for the reuse of the strainer, the government claiming that its own negligence was secondary and passive; and (B) upon an alleged breach of contract by Hydrotherm in providing plans, drawings and specifications inadequate and unsuitable to the work to be executed, in that the plans and specifications provided by Hydrotherm called for the reuse of the 12 inch strainer. The government does not rely on any express agreement to indemnify. No indemnity provision was included in the contract between the United States and Hydrotherm. The government contends, however, that there was an implied contractual agreement by Hydrotherm to indemnify the government against liability in such a case as this.

### A.   The Tort Claim

By the Federal Tort Claims Act, the United States has consented to be sued in tort "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred". 28 U.S.C.A. § 1346(b). In view of that provision, the courts have generally held that the questions whether the United States may enforce the liability of another for contribution or indemnity imposed by law, and whether the United States may be held liable for such indemnity or contribution, should be determined by the law of the place where the accident occurred.[8] United States v. Yellow Cab Co., 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951); Jennings v. United States, 374 F.2d 983 (4 Cir., 1967); Uptagrafft v. United States, 315 F.2d 200 (4 Cir., 1963), cert. den. 375 U.S. 818, 84 S.Ct. 54, 11 L.Ed.2d 52 (1963); United States v. State of Arizona, 216 F.2d 248 (9 Cir. 1954); Guy F. Atkinson Co. v. Merritt, Chapman & Scott Corp., 141 F.Supp. 833 (N.D.Cal., 1956).[9] However,

8. As we have seen, the government has abandoned its claim for contribution, but the principles of conflict of laws dealing with tort liability for indemnity are the same as those dealing with contribution.

9. As pointed out in the *Guy F. Atkinson* case, the decisions which have refused to follow state law have generally involved a matter of specific federal interest, such as the relationship between the United States and its employees, Gilman v. United States, 347 U.S. 507, 74 S.Ct. 695, 98 L.Ed. 898 (1954) (an indemnity case), or between the United States and its military personnel, United States v. Standard Oil Co., 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947) (a case involving the right of the United States to recover for loss of a soldier's services).

this court finds no substantial difference between Maryland law and Federal law with respect to the principles controlling tort liability for indemnity.

The Maryland law is set out in the opinions on the two appeals in Baltimore & Ohio R. Co. v. Howard County Com'rs, 111 Md. 176, 73 A. 656, 40 L.R. A.,N.S., 1172 (1909), and 113 Md. 404, 77 A. 930 (1910). In that case a judgment had been recovered against the indemnitee (the County), which had failed to apprise the indemnitor (B & O) of the pendency of the litigation. In the subsequent indemnity action the Court of Appeals held on the first appeal that the earlier judgment was not binding on the indemnitor and that to prevail the indemnitee had "the burden of again litigating the matter and establishing the actionable facts", including those necessary to establish the indemnitee's liability to the plaintiff in the prior action as well as those giving rise to the indemnity relationship itself. 111 Md. at 187, 73 A. at 659.

On the second appeal the Maryland Court said:

"The general rule is that, wherever the wrongful act of one person results in liability being imposed on another, the latter may have indemnity from the person actually guilty of the wrong (citations omitted). This rule is, however, subject to an important qualification or exception, viz, that as between *actual tort feasors* the law will not enforce contribution or indemnity. * * *" 113 Md. at 414, 77 A. at 933.

The Court added:

" * * * The rule to be applied to the many conditions of fact arising in such cases is stated as follows, with accuracy and clearness, in Gray v. Boston Gas Light Company, 114 Mass. [149] 152: 'When two parties, acting together, commit an illegal or wrongful act, the party who is held responsible in damages for the act cannot have indemnity or contribution from the other, because both are equally culpable, or *particeps criminis*, and the damages result from their joint offense. This rule does not apply when one does the act or creates the nuisance, and the other does not join therein, but is thereby exposed to liability and suffers damage. He may recover from the party whose wrongful act has thus exposed him. In such case the parties are not *in pari delicto* as to each other, though as to third persons either may be held liable. * * *" [10] 113 Md. at 415, 77 A. at 933.

In Union Stock Yards Co. of Omaha v. Chicago, Burlington and Quincy R. R.

10. The Massachusetts Court continued:
"* * * The numerous cases in our own reports are analogous, where towns, having been held liable for an unsafe condition of the highway, have recovered from the persons whose acts caused the unsafe condition. The reasons given in these cases are conclusive on this point. In Lowell v. Boston & Lowell Railroad Company, 23 Pick. 24, the authorities were fully considered, and upon general principles it was held the town could recover, the parties not being *in pari delicto*. No distinction is there made, that the liability is cast upon the town by statute and not by the common law, and no such distinction is noticed in any of the cases which follow it. Lowell v. Short, 4 Cush. 275; Swansey v. Chance, 16 Gray, 303; Milford v. Holbrook, 9 Allen, 17; West Boylston v. Mason, 102 Mass. 341. In the last case, it was said the only fault of the town was the failure to remedy a nuisance which the defendant had created. Nor can there be any such distinction in principle. The ground of the action is that the defendant has by his own unauthorized act exposed the plaintiff to a liability, and it is immaterial whether the liability is imposed by force of a statute or by the rule of the common law. In either case the plaintiff is held liable by inference of law, and not by reason of his active participation in the act which was the occasion of the injury. * * *" See 113 Md. at 415–416, 77 A. at 933–934.

The Maryland Court continued:
"Tested by this rule, we cannot hold upon the evidence in this record as a matter of law that the parties, as between themselves, were equally culpable, or *particeps criminis* with respect to the nuisance or dangerous condition of the road which resulted in the death of Doctor Hill. Upon the case made by the

Co., 196 U.S. 216, 25 S.Ct. 226, 49 L.Ed. 453 (1906), a railroad company had delivered a car with imperfect brakes to a terminal company; both companies had failed to discover the defect, which could have been discovered by proper inspection; and an employee of the terminal company, who had been injured as a direct result of the defective brake, sued the terminal company alone and recovered. In an action brought by the terminal company against the railroad company for the amount paid under the judgment, the Supreme Court held that as both companies were wrongdoers, and were guilty of a like neglect of duty in failing to inspect the car properly before putting it in use, the fact that such duty was first required of the railroad company did not bring the case within the exceptional rule which permits one wrongdoer, who has been mulcted in damages, to recover indemnity or contribution from another, on the ground that the latter was primarily responsible. The Court quoted with approval from Gray v. Boston Gas Light Co., 114 Mass. 149, which had been relied on by the Maryland court in Baltimore & Ohio R. Co. v. Howard County Com'rs, supra.

In Jennings v. United States, 374 F.2d 983 (4 Cir., 1967), a case in which the indemnitor had not been notified, the Fourth Circuit stated in a footnote:

"A right to indemnity is commonly recognized where, although both parties are negligent, the negligence of the indemnitee is considered not as serious as that of the indemnitor; for example, where the indemnitee's negligence is based upon a failure to inspect and thereby discover a defect in an article manufactured by the indemnitor. See 3 Moore, Federal Prac-

tice ¶ 14.11 (2d ed. 1964)." 374 F.2d at 987, fn. 7.

See also United States v. Savage Truck Line, 209 F.2d 442, 447, 44 A.L.R.2d 984 (4 Cir., 1953).

In Guarnieri v. Kewanee-Ross Corp., 263 F.2d 413 (2 Cir., 1959), the court quoted from Anderson v. Liberty Fast Freight Co., 285 App.Div. 44, 135 N.Y. S.2d 559, 561, as follows:

"'The area in which a party held liable for negligence may pass that liability on to another negligent party is closely circumscribed. It encompasses a group of special situations and relationships where it has seemed reasonable to impose an ultimate responsibility on a party seen to have played the active role in the negligence situation in favor of one who is made answerable to the injured party, but whose part in the event is passive or arises from the effect of public policy, contract or status'." 263 F.2d at 420.

The Second Circuit also cited Inman v. Binghamton Housing Authority, 3 N. Y.2d 137, 164 N.Y.S.2d 699, 143 N.E.2d 895, 59 A.L.R.2d 1072 (1957), a precedent which is particularly in point in the case at bar. In the *Inman* case

"* * * plaintiff, an infant, was injured by falling from a stoop of an apartment house. Two suits were brought, one against the Housing Authority and the other against the architects and builder. The Housing Authority in its action served a third-party complaint against the architects and builder claiming a right to indemnity in the event of any recovery against it. The plaintiff's complaint listed three alleged defects as a basis for the assertion of negligence: (1)

plaintiff [the County] the road was safe at the time the defendant [B & O] began work and that the defendant was the sole actual wrongdoer and creator of the dangerous condition in the highway. Of course the plaintiff, under the circumstances, was greatly negligent in not repairing the road, and was liable for the unfortunate result which followed; but the court could not say as a

matter of law upon the facts before it, that it participated with the defendant in the creation of this dangerous nuisance or that it was equally guilty with it with respect to the consequences which ensued." 113 Md. at 416–417, 77 A. at 934.

See also Chesapeake & Ohio Canal Co. v. Alleghany County, 57 Md. 201 (1881).

absence of a protective railing; (2) the manner in which the door opened outward to the stoop; and (3) the inadequacy and improper placement of the step from the stoop to the sidewalk. The builder and the architects moved to dismiss the third-party complaint. The motion was granted at Special Term but reversed by the Appellate Division. The New York Court of Appeals in turn reversed and dismissed the third-party complaint. The Housing Authority had argued that it was only passively negligent whereas the architects and builder were actively negligent. The court held that since the plaintiff's complaint alleged negligence in the construction, maintenance and continuance of an allegedly known defective condition of the premises 'the Authority is cast "in the role of an active tort-feasor, and as such, is not in a position to compel * * * indemnification * * * absent an agreement so to do"' (3 N.Y.2d at pages 146–147, 164 N.Y.S. 2d at page 705, 143 N.E.2d at page 900)." 263 F.2d at 421.

■ To establish its tort claim in the case at bar the government must prove three elements: (1) that it was actually or potentially liable to plaintiffs (whether actual liability need be shown will be discussed below); (2) that the settlement was reasonable; and (3) that the facts are such as to give rise to a duty on the part of Hydrotherm to indemnify the government. To satisfy element (3) the government argues that Hydrotherm's negligence was active or primary and the proximate cause of the injury to Blockston, whereas the government's negligence was passive or secondary or otherwise such that the government and Hydrotherm were not equally culpable.

When a plaintiff's claim has been settled by the indemnitee without giving notice to the indemnitor of the suit, the indemnitee cannot recover from the indemnitor unless the indemnitee proves that it was actually liable to the plaintiff, as well as the reasonableness of the settlement and the facts giving rise to the duty to indemnify. B & O R. Co. v. Howard County Com'rs, supra; Jennings v. United States, supra. But when the indemnitor has been notified of the suit and given an opportunity to defend, the authorities are divided on the question whether proof of potential liability (as well as the reasonableness of the settlement and the facts giving rise to the duty to indemnify) is sufficient,[11] or whether actual liability of the indemnitee to plaintiffs must be proved.[12]

In the case at bar the government brought in Hydrotherm as a third-party defendant, thereby giving Hydrotherm notice of plaintiffs' claim against the government and an opportunity to participate in the defense thereof. If that claim had gone to trial and had resulted in a judgment against the United States, that judgment would have established the actual liability of the United States to the plaintiffs, and could, by the use of separate issues and verdicts, have been made to establish the basis of such liability. If that had been done, the judgment would have been binding on Hydrotherm, not only with respect to the basis of such liability, to aid the government in proving that the facts were such as to give rise to a duty on the part of Hydrotherm to indemnify the government.

However, the government did not let plaintiffs' claim go to trial, but with the approval of the court, settled plaintiffs' claim against the government and the government's claim for indemnity against

11. See, e. g., West Coast Terminals Co. v. Luckenbach S.S. Co., 349 F.2d 568 (9 Cir. 1965); American Export Lines v. Norfolk Shipbuilding Corp., 336 F.2d 525 (4 Cir., 1964); Chicago, Rock Island & Pacific R.R. Co. v. Dobry Flour Mills, Inc., 211 F.2d 785 (10 Cir., 1954), cert. den., 348 U.S. 832, 75 S.Ct. 55, 99 L.Ed. 656 (1954).

12. See, e. g., The Toledo, 122 F.2d 255 (2 Cir., 1941), cert. den., 314 U.S. 689, 62 S.Ct. 302, 86 L.Ed. 551 (1941); Nelson v. Sponberg, 51 Wash.2d 371, 318 P.2d 951 (Sup.Ct.Wash., 1957).

Grimberg. The government argues that the settlement of plaintiffs' claim by the government is as binding on Hydrotherm as a judgment would have been, for two reasons:

(a) Because, the government contends, Hydrotherm acquiesced in the settlement. There is no factual basis for this contention. The record shows clearly that Hydrotherm did not acquiesce in the settlement.

(b) Because the court approved the settlement, as required by 28 U.S.C.A. § 2677.[13]

██ No authority directly in point has been cited or found. This court holds that the settlement is not proof that there was actual liability on the part of the government to plaintiffs, nor even prima facie proof of such actual liability, but is proof (1) of potential liability and (2) of the reasonableness of the settlement. Whether proof of such potential liability is sufficient to satisfy element (1) need not be decided in this case, because the settlement did not establish and the government has failed to prove element (3) —that the facts were such as to impose a duty to indemnify on Hydrotherm. The settlement approved by Judge Winter did not specify which change or charges of negligence made in the complaint justified the settlement, and therefore did not show that the basis of liability or potential liability on the part of the government was a ground which would support a claim for indemnity against Hydrotherm.

As we have seen, the complaint charged the government with negligence in four respects. It alleged that the government knew or should have known that the 12 inch strainer was constructed of cast grey iron, and was designed to be subjected to a maximum hydrostatic pressure of 300 psi; and that with knowledge of such facts the government was negligent in its duty to Blockston: (a) in the preparation of the construction contract (NBY 25061) and specifications which required the relocation and reuse of the 12 inch strainer and a hydrostatic test at pressures in excess of those for which it was manufactured, designed and intended to be used; (b) in failing to warn Blockston of the danger inherent in working around the strainer while under such excessive test pressures; (c) in failing to exercise due care and caution to determine that the strainer would not fail or rupture while subjected to those pressures required under the construction contract with Grimberg; and (d) by such negligence on the part of the government, its agents, servants and employees, the government caused or created an unreasonable risk of harm to Blockston, of which he in the exercise of reasonable care and caution was not aware, and failed to provide Blockston with a reasonably safe place to work.[14]

It may be argued that specification of negligence (a), above, charges secondary, passive negligence on the part of the government.[15] Certainly specification (b) charges active, primary negligence on the part of the government. Specification

---

13. On the other hand, Hydrotherm contends that the settlement was invalid because Judge Winter took no testimony on the issues. Hydrotherm cites Automobile Ins. Co. v. United States, 10 F.R.D. 489 (D.Ore., 1950). Other courts have not gone so far as the court went in the *Automobile Ins. Co.* case, but have determined in various ways whether the settlement was fair to the plaintiff and to the government. The material portion of Judge Winter's statement with respect to the settlement and the material portion of his order are set out in notes 3 and 4, above. Those quota-

tions show that the settlement was validly approved.

14. The statement by plaintiffs' counsel at the pretrial conference did not withdraw any of these charges.

15. It may also be argued that in view of the preliminary allegations of knowledge on the part of the government, that specification may properly be considered a charge of primary, active negligence on the part of the government. See Inman v. Binghamton Housing Authority, supra, as summarized by the Second Circuit in Guarnieri v. Kewanee-Ross Corp., quoted above.

(c) probably charges active, primary negligence; see the *Inman* and *Guarnieri* cases, cited above. Specification (d) may be considered a summary of the first three; if it be considered a separate specification, it charges active, primary negligence.

■ The order approving the settlement, see note 4, did not specify the ground or grounds upon which the potential liability of the government rested, much less the ground or grounds of any actual liability. Consequently, the settlement does not establish that the government was liable to plaintiffs because of passive, secondary negligence on the part of the government and not because of active, primary negligence on its part; nor does the settlement establish that the government and Hydrotherm were not *in pari delicto*. Therefore, the settlement itself does not prove that the facts are such as would give rise to a tort obligation on the part of Hydrotherm to indemnify the government.

At the hearing on the third-party claim, the government did not offer any other evidence sufficient to prove such facts. Indeed, the deposition testimony of Malfitani, offered by the government at the hearing on the third-party claim, tends to show that the proximate cause of the injury to Blockston was either negligence on Blockston's part or active, primary, superseding negligence on the part of Grimberg.[16]

The court concludes that the government has failed to prove that Hydrotherm is obligated to indemnify the government on applicable tort principles.[17]

### B. The Contract Claim

First, we must consider what law governs this issue. In the recent case of Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966), the Supreme Court said:

"* * * In deciding whether rules of federal common law should be fashioned, normally the guiding principle is that a significant conflict between some federal policy or interest and the

16. Malfitani testified:

"Q. Have you an opinion, Mr. Malfitani, as to why this strainer failed during the hydrostatic tests?

"A. Well, I would say that the fitting failed because of the fact that the mechanics [Blockston and another pipefitter] were tightening the cover plate bolts on the fitting while it was subjected to a very high hydrostatic test pressure.

"Q. And how did that cause the failure of the cover plate in your opinion?

"A. Well, it is well noted that it is a dangerous practice to attempt to tighten up a bolt on a piping system which is under hydrostatic pressure and in this particular case, being that it was cast iron, the act of tightening the bolts would cause uneven stresses in the cover plate and therefore cause the cover plate to fracture because of the brittle nature of the cast iron."

Such tightening was directly prohibited by Paragraph 19–9 of the General Safety Requirements Manual, Corps of Engineers, EM 385–1–1, obedience to which was required by the specifications in the Grimberg-United States contract. See paragraph 29(d) of "Additional General Provisions". Paragraph 19–9 in the Safety Manual provided:

"19–9. Repairs shall not be made while pressure vessel is under pressure."

Those facts are supported by other documentary material filed among the papers in this case and not disputed, but not offered in evidence by the government.

17. This decision makes it unnecessary to consider Hydrotherm's argument that the government assumed the risk of the test of the system, and other points made by Hydrotherm based upon answers to interrogatories, admissions made by the government, correspondence between the parties, and portions of depositions not offered in evidence by the government. Such points would be more appropriately advanced as part of Hydrotherm's defense, rather than by motion for summary judgment at this stage. Some of the admissions claimed by Hydrotherm were merely the conditional allegations and answers customary and necessary in connection with a third-party complaint, where the defendant does not admit liability.

use of state law in the premises must first be specifically shown."

See also Clearfield Trust Company v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); Bank of America Nat. Trust & Sav. Ass'n v. Parnell, 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956); Royal Indemnity Co. v. United States, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941); Board of County Com'rs of Jackson County v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313 (1959); United States of America v. State of Arizona, 214 F.2d 389, 392 (9 Cir., 1954), an indemnity case which left the question open; and Guy F. Atkinson Co. v. Merritt, Chapman & Scott Corp., 141 F.Supp. 833, 837 (N.D.Cal., 1956), in which the court applied federal law to the claim for indemnity based on contract, although it had applied state law to the claim for indemnity based on tort. Whether federal or state law should control the contract claim in the case at bar is far from settled.[18]

The contract between the government and Hydrotherm was made in New York, where Hydrotherm's office was located, and was to be performed partly, at least, in Maryland. The conflict of laws question need not be decided if the same conclusion with respect to the contract claim would be reached under New York law, Maryland law or Federal common law.

The government does not contend that the contract between Hydrotherm and the government contained any express agreement by Hydrotherm to indemnify the government under any circumstances. The government claims, however, that it is entitled to rely upon an implied agreement by Hydrotherm to indemnify the government, even against the government's own negligence.

All the courts are agreed that an implied agreement to indemnify exists under certain contractual relationships, as where a surety pays the debt of his principal. On the other hand—

"It is a general rule long established that contracts will not be construed to indemnify a person against his own negligence unless such intention is expressed in unequivocal terms." Thompson-Starrett Co. v. Otis Elevator Co., 271 N.Y. 36, 41, 2 N.E.2d 35, 37 (1936), citing earlier cases.

That rule has been reiterated by the New York court, see Inman v. Binghamton Housing Authority, 3 N.Y.2d 137, 164 N.Y.S.2d 699, 143 N.E.2d 895, 59 A.L.R.2d 1072 (1957), and recognized and applied by the Second Circuit, Guarnieri v. Kewanee-Ross Corporation, 263 F.2d 413, 422 (1959). It is also the law of Maryland. American Radiator & Standard Sanitary Corp. v. Mark Engineering Co., 230 Md. 584, 187 A.2d 864 (1963).[19] So, if either New York or Maryland law applies, it is clear that the government cannot recover upon its claim of implied contractual indemnity.

The federal common law on the question of implied contractual indemnity has not been established, except in cases within the admiralty and maritime jurisdiction. The controlling maritime cases arose after the decisions in Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953), and Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954), had extended a ship's warranty of seaworthiness to protect longshoremen as well as seamen.

In Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Court held that there was an implied warranty of safe stowage in the stevedoring company's contract with the shipowner, and if a breach of this implied warranty caused

18. There are obvious reasons why the government should wish its contracts to be uniformly construed, but other factors besides the proper construction of the contract are involved in deciding whether indemnity should be required in this case. and may affect the question whether federal or state law should be applied.

19. It is generally recognized as the rule adopted by most courts. 27 Am.Jur. (Indemnity § 15), p. 464.

the shipowner to become liable to the stevedoring company's employee, the shipowner could maintain an action against the stevedoring company for indemnity based upon the implied warranty. The Court said that the warranty was one "of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product". 350 U.S. at 133–134, 76 S.Ct. at 237. See also Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958); Crumady v. The J. H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Waterman S.S. Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960); Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963); Italia Soc. v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964).

Several circuits have applied the same principle to other maritime contracts. In James McWilliams Blue Line, Inc., v. Esso Standard Oil Co., 245 F.2d 84 (2 Cir., 1957), the court held that the obligation to indemnify for negligence towage was the same as the obligation to indemnify for negligence stowage under the *Ryan* doctrine. See also Gray v. Johansson, 287 F.2d 852 (5 Cir., 1961); Dunbar v. Henry Du Bois' Sons Co., 275 F.2d 304 (2 Cir., 1960); Tebbs v. Baker-Whiteley Towing Co., 271 F.Supp. 529, 541 (D.Md., 1967). In Newport News Shipbuilding and Dry Dock Co. v. United States, 226 F.2d 137 (4 Cir., 1955), the court held that the failure of a shipyard which was converting a troop ship to a cargo vessel to "blank off" a waste pipe was a breach of contract as well as negligence, entitling the United States as shipowner to indemnity against the yard.

A number of federal decisions have applied the laws of various states to the question of implied contractual indemnity. In the recent case of Alaska Airlines, Inc. v. Northwest Airlines, Inc., 228 F.Supp. 322 (D.Alaska, 1964), the court found no binding Alaska law, and decided, that Alaska would adopt the general rule, approved by Oregon and the Ninth Circuit, "that to impose liability upon an indemnitor for the negligence of the indemnitee, the intention of the parties must be expressed in clear and unequivocal terms". 228 F.Supp. at 326.

In General Electric Co. v. Moretz, 270 F.2d 780 (4 Cir., 1959), cert. den., Mason & Dixon Lines, Inc. v. General Electric Co., 361 U.S. 964, 80 S.Ct. 593, 4 L.Ed.2d 545 (1960), the court allowed a claim by a shipper, which had negligently loaded a piece of equipment onto a truck, for implied contractual indemnity against a carrier, which had failed properly to secure the load before starting on an interstate run. The contract had been made in Virginia, and Virginia law controlled. The Fourth Circuit found that certain relevant statutes (49 U.S.C.A. §§ 20(11) and 319) and Regulations of the Interstate Commerce Commission should be read into the contract and that they supported the shipper's claim for indemnity. The court cited *Ryan*, *Weyerhaeuser* and *Crumady* as applying an analogous principle.[20]

In the instant case the government does not rely upon any specific provision in the contract or any statute or regulation to support its claimed right to contractual indemnity. The government relies on decisions which hold that an architect, in contracting for his services as such, implies that he possesses skill and ability sufficient to enable him to perform the

---

**20.** The court also held that the claim was not barred by the Workmen's Compensation Law of Tennessee. A similar conclusion was reached in Westchester Lighting Co. v. Westchester Co. S. E. Corp., 278 N.Y. 175, 15 N.E.2d 567 (1938), but the Maryland court has reached a somewhat different conclusion, permitting suits based upon an express contractual agreement to assume an obligation of indemnity, as distinguished from an implied or quasi-contractual obligation. American Radiator & Standard Sanitary Corp. v. Mark Engineering Co., 230 Md. 584, 187 A.2d 864 (1963). See also McCross v. Ratnakar Shipping Co., 265 F.Supp. 827 (D.Md., 1967). The Workmen's Compensation Law problem is not involved in the instant case.

required services reasonably well, and that he will exercise and apply in the given case his skill, ability, judgment, and taste reasonably and without neglect. See 5 Am.Jur.2d, Architects, § 8, p. 670 (1962). In Bloomsburg Mills, Inc. v. Sordoni Construction Co., 401 Pa. 358, 361–362, 164 A.2d 201, 203 (1960), the court said: "While an architect is not an absolute insurer of perfect plans, he is called upon to prepare plans and specifications which will give the structure so designed reasonable fitness for intended purpose, and he impliedly warrants their sufficiency for that purpose". Although no decisions directly in point have been cited by either side, the court assumes that the same principles apply to engineers such as Hydrotherm.

The contract between the United States and Hydrotherm contained the provision: "All services to be rendered hereunder shall be subject to the direction and approval of the Officer-in Charge", but also provided: "Approval by the Officer-in-Charge of drawings, designs, specifications and other incidental architectural-engineering work or materials furnished hereunder shall not in any way relieve the contractor of responsibility for the technical adequacy of the work".[21]

Hydrotherm was undoubtedly obligated to use due care in the preparation of the plans and specifications, but it does not necessarily follow that there was an implied contractual obligation on the part of Hydrotherm to indemnify the government under the circumstances presented by this case.

Those circumstances include:

(a) The absence of any indemnity provision in the contract between Hydrotherm and the government. There was not even a provision in the Hydrotherm contract similar to the provision in the Grimberg contract that the "Contractor * * * shall be responsible for all damages to persons or property that occur

as a result of his fault or negligence in connection with the prosecution of the work".

(b) The absence of any statute or regulations, such as were involved in General Electric Company v. Moretz.

(c) The preparation of the specifications by Hydrotherm and their approval by the government engineers without either Hydrotherm or the engineers having checked the plans and specifications of the existing system. Those plans and specifications were available to both Hydrotherm and the engineers, and if examined would have shown the rated capacity of the 12 inch strainer and the material of which it was made.

(d) The sophistication of both contracting parties, Hydrotherm and the government engineers. The government is not in the position of an ordinary purchaser of a manufactured article. The government engineers were aware of the risks inherent in the test of the system during which Blockston was injured.

(e) The negligence on the part of Grimberg and his employees, whether or not Blockston himself was negligent. See note 16, above.

■■■ As we have seen, the general rule is that to impose liability upon an indemnitor for the negligence of the indemnitee the intention of the parties must be expressed in clear and unequivocal terms. The only exceptions are where some statutory or other policy reason overrides the general rule. Such a statutory policy existed in General Electric Co. v. Moretz; and the decisions in the maritime cases were clearly policy decisions. There is no such statutory or other policy reason in this case to override the general rule. If the parties had intended that Hydrotherm should indemnify the government under the circumstances set out above, they could and should have inserted a provision in the contract making their intention clear.

**21.** The Pennsylvania court in *Bloomsburg* said: " * * * the fact that a responsible officer of the plaintiff corporation approved the plans did not excuse the defendants from the exercise of ordinary and reasonable skill in providing plans that were adequate." 401 Pa. 358, at 362, 164 A.2d 201, at 203.

Not only is there no clear agreement by Hydrotherm to indemnify the government, there is no indemnity provision at all.

This court concludes that neither Maryland law, New York law nor federal common law would read into the contract an implied obligation on the part of Hydrotherm to indemnify the government under the circumstances of this case.[22]

### Conclusion

The motion to dismiss under Rule 41 (b) and (c) must be granted. An appropriate judgment order will be entered.

---

**22.** It should also be noted that even if this were a situation where an indemnity clause should be implied, as in the stevedoring cases or the *General Electric* case, the burden would still rest on the government to prove that the proximate cause of Blockston's injury was the breach of the implied warranty by Hydrotherm, and not some other intervening cause. As noted above, in the discussion of the tort claim, the settlement and the order approving the settlement do not establish the facts of the accident or the ground or grounds of the government's liability, and the additional evidence offered by the government at the trial of the third-party claim indicates that Grimberg's negligence was the proximate cause. Therefore, even though *Weyerhaeuser* teaches that questions of primary or secondary, active or passive negligence on the part of the indemnitor and indemnitee have no place in contractual indemnity, if the negligence of Grimberg was a superseding cause, it was a complete defense to the government. If Grimberg's negligence was not a superseding cause, it might still have entitled the government to indemnity from Grimberg.